**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

RUSSELL W. SHAW,

         Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

         Defendant.

No. C04-4110-MWB

**REPORT AND RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

*I.*     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

    *A.*    **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    *B.*    **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

        *1.*    **Introductory facts and Shaw's hearing testimony** . . . . . . . . . . . **3**

        *2.*    **Shaw's medical history** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

        *3.*    **Vocational expert's testimony** . . . . . . . . . . . . . . . . . . . . . . . **10**

        *4.*    **The ALJ's decision** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

*III.*   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . . **13**

    *A.*    **Disability Determinations and the Burden of Proof** . . . . . . . . . . . . **13**

    *B.*    **The Substantial Evidence Standard** . . . . . . . . . . . . . . . . . . . . . . **16**

*IV.*   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*V.*    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

## I.  INTRODUCTION

The plaintiff Russell W. Shaw ("Shaw") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits.  Shaw argues the ALJ improperly discounted the opinions of his treating psychiatrist and an examining physician, erred in failing to obtain a psychological evaluation, and posed an improper hypothetical question to the Vocational Expert.  (*See* Doc. No. 8)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural Background

On October 16, 2002, Shaw filed an application for DI and SSI benefits, alleging a disability onset date of August 4, 1999.  (R. 39-41165-80)  Shaw alleged he was disabled due to wrist weakness and numbness, and lack of feeling in his right hand.  (R. 47)  His applications and requests for reconsideration were denied.  (R. 181-87, 21-32)

Shaw requested a hearing (*see* R. 33), and a hearing was held before ALJ Robert Maxwell on February 23, 2004, in Spencer, Iowa.  (R. 124-64)  Shaw was represented at the hearing by attorney Frank Tenuta.  Shaw testified at the hearing, and Vocational Expert ("VE") William Tucker also testified.

On May 4, 2004, the ALJ ruled Shaw was not entitled to benefits.  (R.10-19)  Shaw appealed the ALJ's ruling, and on September 10, 2004, the Appeals Council denied Shaw's request for review (R. 4-7), making the ALJ's decision the final decision of the Commissioner.

Shaw filed a timely Complaint in this court, seeking judicial review of the ALJ's decision.  (Doc. No. 5)  In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Shaw's claim. Shaw filed a brief supporting his claim on March 4, 2005. (Doc. No. 8) The Commissioner filed a responsive brief on April 25, 2005 (Doc. No. 9), and Shaw filed a reply brief on May 4, 2005 (Doc. No. 10).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Shaw's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Shaw's hearing testimony

Shaw was fifty-eight years old on his alleged disability onset date, and sixty-two years old at the time of the hearing. He is six feet tall and weighs 150 to 155 pounds. He lives alone in his mother's house in Spencer, Iowa, his mother having moved to a nursing home. He receives income from Social Security Early Retirement, and food stamps from another program. (R. 129-30) He gets around by riding a bicycle or walking. (R. 150-51)

Shaw graduated from high school in 1969. He attended college for two years, but did not complete a degree program. At the time of the hearing, he was enrolled in on-line classes through Western Iowa Tech Community College in Sioux City, Iowa, to learn computer networking. (R. 131) Shaw cannot use a keyboard, but he operates a computer by utilizing a program that displays the keyboard on the screen, and then he can point to the letters and click to type. He is able to prepare documents and enter information using the program. (R. 135, 143-44) He pays for his courses through a Pell Grant and a Stafford Loan, and the school provides him with a computer to use at home for purposes of the courses. He took three classes in the fall of 2003, and earned a D in each of the classes. He was enrolled in two classes during the spring of 2004. (R. 145, 150)

According to Shaw, he is not eligible for Vocational Rehabilitation services because he has not been declared disabled. (R. 132) He stated Vocational Rehabilitation did not administer any tests before denying him services. (R. 146)

Shaw worked for about thirty years as a drywall finisher. He was injured in August 1999, when he "jumped off a horse" and broke his right arm and right wrist. (R. 132) He is right-handed. Shaw tried to return to work as a drywall finisher, but he was unable to put any pressure on his right hand and he could not do the work. (R. 132-33) He attempted some other jobs. He put inserts into newspapers at the "Spencer Daily Report," but he was unable to meet the pace expected by his employer and he was fired. (R. 133-34, 136) Shaw worked for a janitor service during March and April 2001, but he was unable to hold a broom so he was fired. (R. 136)

Shaw used to enjoy fishing, but he no longer can hold a fishing hook. He had a Wisconsin driver's license that expired, and he has never gotten an Iowa license. According to Shaw, he cannot get an Iowa license until he returns to Wisconsin to clear up an old ticket, and he has no way to return to Wisconsin. (R. 137)

Shaw is not receiving any medical treatment currently, which he claims is due to lack of funds. (R. 138, 147-48) However, no doctor has refused to see him because he could not pay. (R. 148) He saw a psychiatrist six to eight times, and the doctor prescribed some different medications for him, but he quit taking the medications and seeing the psychiatrist because, according to Shaw, he had a reaction to a medication the doctor prescribed. (*See* R. 138-39) In any event, he did not think any of the medications helped him. (R. 139)

Shaw was taking Alka-Seltzer Gold "for quitting smoking." (R. 140) He stated he had "researched it on the Internet," and the medication was supposed to help with smoking cessation. He was taking Vivarin because it made him "feel good." (*Id.*) He

had cut his cigarette use from four packs a day three years ago, to half a pack a day by the time of the hearing. (R. 153) He also was taking vitamins and eating tomatoes, stating a psychiatrist had told him this would help him feel "[m]entally clear in the morning." (R. 140)

Shaw takes care of his home the best he can. (R. 141) He has lived alone for four years, and receives very little assistance from anyone in performing his daily activities or housework. (R. 146-47) He can push a lawn mower with his left hand, using his right hand only as a guide. Several times daily, his right hand tingles and becomes numb, and he has to hold his hand down at his side and shake it until the stiffness goes away. Sometimes he can carry objects with his right hand, but not often, and he stated he has become "left-hand predominant." (R. 141)

Shaw went to see Dr. Creswell for an evaluation, at "the State's request." (*Id.*) According to Shaw, Dr. Creswell spent about an hour with him performing the examination. A nurse tested his strength and range of motion of his arms before he saw the doctor. Shaw believes he could lift anywhere from ten to fifty pounds perhaps once weekly, but not frequently or on any sustained basis. (R. 142) However, no doctor has restricted Shaw's activities because of his health problems. (R. 148) He had his hearing checked, but the doctor did not prescribe any type of hearing aids. (R. 149) He experiences ringing in his ears that he attributes to a viral infection he had several years ago. (R. 152)

## 2. *Shaw's medical history*

The record contains scant evidence of Shaw's impairments. On August 4, 1999, Shaw's son took him to the emergency room after Shaw was thrown from a horse, fracturing his right wrist. Closed reduction was performed and Shaw was placed in a

cast. (R. 85-88) At a follow-up exam six weeks later, the hard cast was removed and Shaw was placed in a soft wrist splint and scheduled for occupational therapy "to work on range of motion and grip." (R. 89) He was advised to wait two weeks, and then begin using his wrist as tolerated. (*Id.*) At his next follow-up exam on November 16, 1999, Shaw reported he had "tried to work painting and just was not able too [sic], due to wrist pain. Taking out screws and hinges and that kind of activity is painful for him." (*Id.*) The doctor advised Shaw that his recovery was progressing normally. He sent Shaw back to physical therapy "to work on strengthening and decrease his pain, increase his motion." (*Id.*) He prescribed Vioxx, and directed Shaw to return in six weeks for recheck and new X-rays. (*Id.*) Shaw missed his next appointment on December 28, 1999, and doctor's notes indicate attempts to contact Shaw failed because his telephone had been disconnected. There is no evidence Shaw ever sought further medical treatment for his wrist.

Shaw's wrists and hands were evaluated by Occupational Therapist Ruth Vetter at Spencer Hospital on September 5, 2000. Ms. Vetter performed range of motion testing and noted, with regard to Shaw's right hand, that he was able to oppose his right thumb to all fingers, make a full fist, and extend his fingers fully. His grip strength was 80 pounds on the right, which she noted was "in the normal range for his age." (R. 92) Ms. Vetter concluded, from all the testing, that Shaw's "fine motor test results indicate he is functioning within the normal limits for his age." (R. 93)

Ronald J. Creswell, M.D. performed a disability physical examination of Shaw on November 7, 2002. (R. 103-04) Dr. Creswell noted the muscles surrounding Shaw's right wrist and in the proximal lateral right hand were somewhat atrophied. He had negative carpal compression test and negative Tinel's sign. Shaw expressed pain upon flexion of his right wrist, and he had diminished range of motion of his right wrist,

although above the wrist, his right upper extremity showed good range of motion. He was able to make a fist, and the doctor noted his "[h]and grasp on the right is only slightly weaker than the left. Definitely weaker however to extension, flexion and lateral deviation of that right wrist." (R. 104) He was able to touch his right thumb to each finger of his right hand, and he had adequate pulses. The doctor opined Shaw might have "some sort of neurologic compromise in that right hand and wrist. Certainly could be some injury to the nerve or some sort of dystrophy." (*Id.*) He opined Shaw would be unable to handle objects with his right hand, and was "unable to use the right hand in any meaningful fashion" with regard to lifting and carrying. (*Id.*) He opined Shaw would be unable to kneel, crawl, or climb because of difficulty using his right hand, but he could stoop, stand, move about, walk, and sit without difficulty, and he could use his left hand without problems. (*Id.*)

Dr. Creswell opined Shaw might have difficulty finding work, not only because of the problems with his right wrist, but also due to his personality. He noted Shaw went off on tangents and did not answer questions directly, and he appeared to be in a "manic type of phase." (*Id.*) He questioned whether Shaw might have some undiagnosed mental health issues. (*Id.*)

On January 1, 2003, Dennis A. Weis, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 109-16) Dr. Weis opined Shaw would be able to lift fifty pounds occasionally and twenty-five pounds frequently; stand, walk, or sit for six hours in an eight-hour day; and push/pull with some limitations in his right hand. The doctor opined Shaw would be limited in gross fine manipulation and feeling in his right hand. He stated Shaw should crawl, and climb ladders, ropes, and scaffolds only occasionally. No other limitations were noted. (*Id.*)

In his review summary, Dr. Weis noted Shaw's credibility was questionable because despite complaints of ongoing, worsening pain, Shaw did not take any medications for pain and he had not received any medical attention in several years. Consultative examinations indicated he had returned to normal functioning since his wrist injury. Dr. Weis found Dr. Creswell's statement that Shaw could do nothing meaningful with his right hand to be contradicted by Dr. Creswell's lack of substantial findings on examination. (R. 107) J.D. Wilson, M.D. reviewed Dr. Weis's findings on April 16, 2003, and concurred in his assessment. He noted Shaw's credibility continued to be eroded by his failure to seek medical attention for his problem. (R. 108)

On July 9, 2003, Shaw saw Anjum Bashir, M.D., a psychiatrist, for an evaluation, at the request of his son and daughter-in-law. (R. 117-18) Shaw's son indicated he thought Shaw was depressed because Shaw never wanted to do anything, had poor sleep and appetite, had lost weight, and had poor concentration and memory problems. The son thought Shaw might have problems with dementia. (R. 117) Dr. Bashir noted Shaw had fair grooming and hygiene and good eye contact. His affect was "somewhat inappropriate and immature," and Shaw "laughed a couple of times that were inappropriate." His mood was "okay." Shaw described a ringing in his ears, and the doctor speculated this could be due to either a physical problem or a delusional quality. He noted Shaw's insight and judgment "seemed to be limited." (R. 118)

Dr. Bashir diagnosed Shaw with "Major depressive disorder with possible psychotic features, [rule out] Dementia, [rule out] Bipolar disorder." (*Id.*) He assessed Shaw's GAF at 45, indicating serious symptoms or serious impairment in functioning. He recommended Shaw obtain a psychological evaluation, and he gave Shaw and his son a number to call to set up the evaluation. He gave Shaw samples of Lexapro and

Risperdal. He noted he would continue to evaluate Shaw "for possibilities of Alzheimer's Dementia and BiPolar disorder," and he directed Shaw to return in four weeks. (*Id.*)

Shaw saw Dr. Bashir again on August 28, 2003. By that time, his medications had been changed to Paxil CR and Zyprexa, so it appears he must have seen or talked with the doctor between July 9, 2003, and August 28, 2003, although no evidence of this appears in the record. Shaw indicated he was taking the Paxil but he had discontinued the Zyprexa because it made him too tired. The doctor noted Shaw "appear[ed] quite bizarre in his presentation." His speech was pressured and it was difficult to understand what Shaw was talking about. Dr. Bashir diagnosed Shaw with BiPolar Disorder with psychotic features and assessed his GAF at 45. He continued Shaw on Paxil CR, discontinued the Zyprexa, and started him on Abilify. He directed Shaw to return for follow-up in two weeks. (R. 121)

Shaw returned to see Dr. Bashir on September 17, 2003. Shaw apparently had quit taking Paxil "although it was helping," and also had quit taking the Abilify. The doctor noted Shaw "said that these medicines help him relax," which fails to explain why he discontinued the medications. He was taking vitamins. Shaw reported his sleep and appetite were "okay." He appeared "[s]omewhat inappropriate with some pressure of speech as well as flight of ideas," and he evidenced limited insight and judgment. The doctor's diagnosis was BiPolar Disorder with psychotic features, and he assessed Shaw's GAF at 45. He started Shaw on Seroquel, and discontinued the Paxil and Abilify because Shaw was not taking them. (R. 120)

Dr. Bashir saw Shaw again on October 16, 2003. Shaw reported that he had been in church the previous Sunday, felt dizzy, and was taken to the hospital, where "all kinds of testing" revealed his blood pressure was low. He stated he was cutting down on smoking. He complained of "side effects from Seroquel," although he noted his dizziness

had been ongoing for a long time. He was still taking vitamins, and he described his sleep and appetite as good. Shaw did not want to take any more medications until he stopped smoking. The doctor's diagnosis remained unchanged. He assessed Shaw's GAF at 46. He directed Shaw to return for follow-up in four weeks, at which time Shaw indicated he might be willing to try the Seroquel again. (R. 119) It does not appear Shaw ever returned to see Dr. Bashir.

**3.      *Vocational Expert's testimony***

VE William B. Tucker stated Shaw's only past relevant work was as a drywall finisher. (R. 155-56; *see* R. 84) He further stated Shaw would have acquired no transferable skills, and his current educational course work would not add anything material to his relevant abilities. (R. 156-57)

The ALJ asked the VE to consider a person between 60 and 65 years of age with a high school education, Shaw's work history, and "a medically determinable impairment causing the same work-related limitation described by Mr. Shaw in his testimony." (R. 157) If Shaw's testimony were given full weight and credibility, then the ALJ stated he could not return to his prior work, nor could he perform any unskilled medium jobs. (*Id.*) The same would be true if the individual were under 60 years of age but over 55 years of age. (R. 158)

The ALJ then asked the VE to consider an individual between 60 and 65 with Shaw's education and work experience, and the following limitations:

> What if you assume a person could occasionally lift and carry 50 pounds, frequently 25 pounds[;] could stand or walk or sit with normal breaks for six hours of an eight-hour day, push/pull activities that do not limit with the lower extremities, they do limit with the upper extremities – and I'll get to that later on in the question. Posturally, they're all –

> all postural activities are frequent, except that there would be occasional climbing of ladders, ropes, or scaffolds, and occasional crawling. From a manipulative standpoint, they don't have any limitations in reaching. They don't have – or feeling. They don't have any limitations with the left upper extremity, which you may assume is the non-dominant extremity. With the dominant extremity, they do have limitations in handling and fingering. And . . . limits to gross and fine use of the right hand to frequent, which is going to rule out constant. . . . [A]ssume no visual or communicative or environmental limitations.

(R. 158-59)

The VE indicated the hypothetical individual could not return to drywall work, but could perform work as a laundry labeler, hand packager, or dining room attendant. (R. 159) If the hypothetical individual were under age 60, but all other factors were the same, the VE stated his opinion would not change. (*Id.*)

Shaw's attorney then asked the VE to consider an individual of Shaw's age, education and employment background who was unable to use his right hand in any meaningful fashion, but could use his left hand, and could stand, move about, walk, sit, and stoop, but could not kneel, crawl, or climb, and could not handle objects with his right hand. The VE stated such an individual would be "limited to jobs that are performed primarily one-armed," giving examples of light, unskilled jobs such as car wash attendant, arcade room or casino game attendant, or cashier II. (R. 161) The VE's response would remain the same if the individual were under or over sixty years of age. (R. 161-62)

Shaw's attorney then asked the VE to consider the same individual, but to add as a factor that the individual had been diagnosed with a major depressive disorder with possible psychotic features, and a GAF of 45. The VE responded, "Generally a score of

50 or below on the Global Assessment of Functioning is considered below competitive employment level." (R. 162)

### 4. *The ALJ's decision*

The ALJ found Shaw had not performed any substantial gainful activity since his alleged disability onset date. His limited work activities since that time were deemed by the ALJ to be unsuccessful work attempts. (R. 14)

The ALJ found Shaw has a severe impairment consisting of "fractured wrist (status post one fracture)," but his impairment does meet or equal the Listing criteria. (*Id.*) The ALJ further found the evidence does not support a finding that Shaw has a severe mental impairment, noting Shaw's lack of any significant mental health treatment and only minimal psychological counseling. (R. 14-15)

The ALJ found Shaw's wrist impairment limits him "to performing a range of medium work activities; however, to the extent [he] alleges that his impairments prevent him from performing even sedentary work activities on a sustained basis, his subjective complaints and alleged limitations are not fully persuasive." (R. 15-16) The ALJ based his credibility assessment on the lack of objective evidence or medical treatment of Shaw's wrist despite his ongoing claims of constant pain. In addition, he noted Shaw had not received medical treatment for several years, and he took no pain medications. The ALJ also found the record contained no objective evidence that Shaw is unable to use his right hand. (R. 16)

The ALJ found Shaw to have the residual functional capacity to lift/carry twenty-five pounds frequently and fifty pounds occasionally; sit, stand, or walk for six hours out of an eight-hour day; use his upper extremities occasionally in pushing or pulling; perform limited handling and fingering with his right hand; frequently climb stairs,

balance, stoop, kneel, and crouch; occasionally crawl and climb ladders, ropes, or scaffolds; and no environmental, visual, or communicative limitations. (*Id.*)

The ALJ relied on the VE's testimony in finding Shaw is unable to return to his past relevant work, and he has no transferable skills. The ALJ also noted Shaw "has manipulative limitations that narrow the range of medium work he is capable of performing." (R. 17) However, the ALJ concluded Shaw would be capable of performing the duties of unskilled work such as laundry worker, hand packager, and dining room attendant. (*Id.*) As a result, the ALJ found Shaw was not disabled, and was not entitled to receive DI benefits or SSI payments. (R. 18, 19)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Dixon v. Barnhart*, 353 F.3d 602,

605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the

14

claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that

there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999));

*accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796; *Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v.*

*Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations

> by third parties and treating and examining physicians relating
> to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).   *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV. ANALYSIS

Shaw argues the ALJ erred in several respects. First, he argues the ALJ improperly disregarded the opinions of Dr. Bashir, who "noted some paranoia related to Mr. Shaw's mental condition," and Dr. Creswell, who opined Shaw was unable to use his right hand. (Doc. No. 8, p. 9) Shaw takes issue with the ALJ's conclusion that Dr. Creswell's opinion should carry little weight because it was based solely on Shaw's own statements. He claims the ALJ acknowledged his decision was "based solely on the assessments of non-examining physicians," and consequently, the decision is not supported by substantial evidence in the record. (*Id.*, pp. 9-10) He further argues that if Dr. Creswell's opinion is given controlling weight, then Shaw must be found disabled based on his age, educational background, and the fact that he would be limited to light, unskilled work. (*Id.*, p. 11)

The court notes Shaw saw Dr. Creswell only once, and the doctor did not review any of Shaw's past medical records. Dr. Creswell is not a treating source, *see* 20 C.F.R. § 404.1502, and the ALJ was entitled to consider the fact that Dr. Creswell's statement

regarding Shaw's limited use of his right hand was based solely on Shaw's statement. A claimant's "statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528(a). Dr. Creswell noted Shaw's grip strength on the right was only slightly less than on the left, he had very good range of motion, he could make a fist with his right hand, and he could touch his right thumb to each of the fingers on his right hand. (R. 104) These findings belie a total lack of functioning of Shaw's right hand. The court finds substantial evidence in the record supports the ALJ's conclusion that Shaw is not disabled due to his physical impairment.

The court cannot accept as easily the ALJ's conclusion regarding Shaw's mental capacity. The record contains substantial evidence that Shaw has a severe mental impairment that was not adequately addressed by the ALJ. Although Dr. Bashir saw Shaw for only three months, he saw him regularly and he continually assessed Shaw's GAF at only 45-46, a level the VE testified was below that required to maintain gainful employment. Further, Dr. Bashir saw Shaw just a few months prior to the ALJ hearing. The court finds Dr. Creswell's speculation regarding Shaw's mental capacity, coupled with Dr. Bashir's objective clinical findings, mandated further inquiry by the ALJ into Shaw's mental capacity. Shaw's lack of significant, ongoing mental health treatment may not be probative considering his diagnosis of Bipolar Disorder. The symptomology of the disease is such that patients often go off of prescribed medications and fail to follow-up with physicians as appropriate. It appears from the record that during a manic phase, Shaw went off of his prescribed medications despite reporting to Dr. Bashir that the medications were helping him to relax. The doctors' notes and Shaw's testimony tend to indicate Shaw has impaired mental functioning, but the evidence of record is insufficient to conclude whether his mental impairment rises to the level of a disability for purposes of his claim.

The court therefore finds this matter should be remanded to obtain further evidence, and for further consideration of whether Shaw is disabled due to a mental impairment from and after July 9, 2003.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed, and this case be remanded for further proceedings consistent with the above opinion.

**IT IS SO ORDERED.**

**DATED** this 3rd day of August, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1] Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).